# STATE OF MICHIGAN

# COURT OF APPEALS

---

JOHN ALLEN LIEBERMAN,

        Plaintiff-Appellee,

v

KIMBERLY ANN ORR, formerly known as
KIMBERLY ANN LIEBERMAN,

        Defendant-Appellant.

FOR PUBLICATION
March 7, 2017

No. 333816
Clinton Circuit Court
LC No. 13-024442-DM

---

Before: M. J. KELLY, P.J., and O'CONNELL and BECKERING, JJ.

O'CONNELL, J. (*dissenting*).

The majority's visceral response to a major change in the parties' parenting time is understandable, but on a close scrutiny, I conclude the trial court's analysis of the facts, the law, the process, and its application of the law in this case was faultless. The majority opinion frames this case as involving a change of custody, but this is not a change of custody case: this is a factually complex parenting time case in which the trial court ultimately held the children's educational needs paramount to the parents' dispute over which of them should have more time with the children.

In other words, the trial court in this case did exactly what it should do when faced with a complex family law issue—it followed the procedures this Court has outlined to resolve such disputes and, in the end, placed the children's best interests first. I respectfully dissent from the majority's conclusion that the trial court committed a clear legal error in the framework it applied to this case.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant-mother, Kimberly Ann Orr, and plaintiff-father, John Allen Lieberman, divorced in 2008. Their consent judgment granted Orr sole physical custody of their two children, granted joint legal custody to both parties, and granted Lieberman a liberal amount of parenting time. In 2010, the trial court allowed Orr's motion to change the children's residence from their previous home in East Tawas, Michigan. Orr moved to DeWitt, Michigan, and Lieberman moved shortly thereafter to Midland, Michigan.

Parenting time changed after the parties moved. In February 2011, the parties stipulated to Lieberman having parenting time three weekends a month and during the majority of the

-1-

children's summer vacation. As a result, Lieberman received 140 overnights a year and Orr received 225 overnights a year. In December 2013, Orr filed a motion for a change in parenting time. Her motion requested a modification of parenting time to expand her summer and weekend time with the minor children.[1]

A referee heard the motion on January 28, 2014. The referee found that the children had an established custodial environment with both parents. Following Orr's objections, the trial court held a hearing on March 20, 2014. After considering the parties' admissions and the stipulated parenting time order from 2011, the trial court found that the children looked to both parents for guidance, discipline, the necessities of life, and parental comfort. Accordingly, it agreed with the referee's finding that the children had an established custodial environment with both parents.[2]

In May 2016, Lieberman moved to change the children's school to Midland Academy. He alleged that the youngest child began struggling in school in 2014 and his fluency scores in reading and math approached the cut-off point for risk. While the child improved with tutoring over the summer of 2015, he again began falling behind during the 2015-2016 school year. Lieberman sought to facilitate the change by "swap[ping] the current parenting time schedule" so that the children would reside primarily with Lieberman during the school year and with Orr during most weekends and the majority of summer vacation.

Orr moved to dismiss the petition, alleging that Lieberman had not stated proper cause or a change of circumstances sufficient to justify modifying the children's parenting time. The trial court ruled that the younger child's issues with school performance and both children's issues with hygiene might constitute a proper cause or change of circumstances sufficient to warrant revisiting the parenting time order. The trial court allowed the case to proceed to a hearing, stating that it would make its ruling regarding change of circumstances after the parties presented proofs.

The parties presented evidence that both are extensively involved in the children's lives. Lieberman testified that he and the children enjoyed visiting museums, fishing, mountain biking, and kayaking together. Orr testified that she and the children enjoyed fishing, boating, camping, and horseback riding together. Both parties testified about their involvement in the children's schooling, both parties presented evidence that the children discussed daily concerns and life events with them, and both parties presented evidence of supportive and nurturing home environments.

---

[1] It could be considered a harbinger of things to come that Orr complained of the burdensome responsibility of day-to-day parenting, including assuring that the children's school assignments and homework were completed, and sought more fun and recreational time with the children.

[2] At oral argument and in the briefs filed with this Court, the parents conceded that the children have an established custodial environment with both of them. As I will discuss in Section V, this is an important development that the majority overlooks.

Both parties also testified that after the youngest child began to struggle with reading, they assisted. Lieberman testified that after the younger child's test scores began falling, he engaged Sylvan Learning Center for educational assistance. Catherine Ringey, the Director for Sylvan Learning Center in Midland, testified that some children do better with more individualized instruction. According to Ringey, Sylvan assessed the younger child when he was in third grade and the child initially scored in the 29th percentile for reading and the 27th percentile for math. Sylvan recommend tutoring the child as much as possible.

By the end of the summer of 2015, the child was in the 54th percentile for reading and "his confidence soared." Ringey characterized the child's improvement as impressive, but she wanted the child to advance to around the 80th percentile to be competitive "through school and in college and jobs . . . ." According to Lieberman, he reached out to Orr about enrolling the child in Sylvan during the school year, but Orr did not do so.

Orr testified that she did not trust Sylvan's for-profit nature and did not enroll the child in tutoring during the school year because he was close to reaching his benchmark proficiencies. Instead of paid tutoring, Orr practiced reading and math with the child at home and asked the child's teacher to enroll him in a special class. Ringey testified that as a result of not receiving tutoring during his fourth grade year, the child's reading score dropped to the 50th percentile because he was not progressing at the same rate as his peers. The child was also eventually enrolled in math tutoring, and his math percentile score improved from the 27th to the 63rd percentile.

Lieberman testified that he was seeking to modify parenting time so that he could enroll the children in Midland Academy because it has small class sizes, a focus on arts, sciences, and extracurricular activities, and creates a curriculum for each individual child. Orr testified that uprooting the children from their current school environment was unreasonable and she was concerned that Midland Academy did not offer extracurricular programs that the older child enjoyed.

Following the hearing, the trial court ruled that the case was a parenting-time case that was primarily about changing schools. It found that the children shared their concerns with both parents, and both parents provided the children with material needs and supported them in their activities, and

> the children in this case have two great parents, and I'm very impressed with the extended families and step families, it seems like these kids have a lot of people that love them, a lot of people they feel comfortable around.

Accordingly, it found that the children had an established custodial environment with both parents. It also found that the proposed modification to parenting time would not affect the children's relationships with their parents.

On that basis, the trial court made its findings regarding the children's best interests to the preponderance of the evidence standard. Considering the best interest factors, it found that the parties were equal in most factors. However, it found that the capacity to give the children guidance, and the home, school, and community record of the children favored Lieberman

because he was more proactive in remedying the younger child's academic difficulties. The trial court found that Orr's more relaxed parenting style may have contributed to the children's educational and hygiene issues. Finally, the trial court found that the parties' willingness to facilitate a close relationship with the other parent slightly favored Lieberman.

Ultimately, the trial court found that (1) a proper cause or change of circumstances exist, (2) a preponderance of the evidence supported that changing the children's school to Midland Academy, and (3) changing the parenting time schedule to accommodate the change in school was in the children's best interests. The trial court switched Lieberman and Orr's parenting time schedules so that Orr received 140 overnights a year, primarily during weekends and the summer, and Lieberman received 225 overnights a year, primarily during the school year.

## II. JURISDICTION

As an initial matter, this Court lacks jurisdiction to hear this case as an appeal of right. Orr has appealed an order modifying parenting time and addressing school enrollment. In the recent case of *Ozimek v Rodgers*, ___ Mich App ___, ___; ___ NW2d ___ (2016); slip op at 7, this Court concluded that neither school enrollment nor parenting time orders are "final orders" appealable by right.[3] The order in the present case is only appealable by leave, and because this Court has not granted leave to appeal, we do not have jurisdiction to hear this case.

This case is a prime example of why parenting-time orders are and should be appealable by leave only. Public policy favors prompt and final adjudication of custody disputes. See MCL 722.28. Sagas about parenting time are best resolved by judges on the family division of the circuit court, where the same judge consistently rules on matters concerning a single family, allowing trial court judges to become intimately familiar with the facts and situations of each family, the best interests of the children, and the impact of the changes and the parties' disputes on the stability of the children's environment. In this case, the saga has taken place over 9 years and has involved a fluid, changing parenting-time situation. The trial court is in the best position to end the struggle for control between the parents by ruling on what is in the best interests of the children from its outside, yet intimately familiar, seat.

## III. STANDARDS OF REVIEW

This Court must affirm custody orders "unless the trial judge made findings of fact against the great weight of evidence or committed a palpable abuse of discretion or a clear legal error on a major issue." MCL 722.28. The trial court commits clear legal error "when it incorrectly chooses, interprets, or applies the law." *Corporan v Henton*, 282 Mich App 599, 605; 766 NW2d 903 (2009). We review de novo the trial court's determinations on questions of law. *Id*.

---

[3] The Michigan Supreme Court has recently granted arguments on leave to appeal this case. *Ozimek v Rodgers*, ___ Mich ___ (2017).

We review the trial court's decision regarding whether a party has demonstrated proper cause or a change of circumstances to determine whether it is against the great weight of the evidence. *Id.* We also review the trial court's finding regarding the existence of an established custodial environment under the same standard. *Pierron v Pierron*, 486 Mich 81, 85; 782 NW2d 480 (2010). A finding is against the great weight of the evidence if the evidence clearly preponderates in the other direction. *Corporan*, 282 Mich App at 605.

## IV. LEGAL STANDARDS

Before making any decision that would affect the welfare of the child, the trial court must determine whether the decision would modify the child's established custodial environment. *Pierron*, 486 Mich at 85. Not every parenting time adjustment will modify a child's established custodial environment:

> While an important decision affecting the welfare of the child may well require adjustments in the parenting time schedules, this does not necessarily mean that the established custodial environment will have been modified. If the required parenting time adjustments will not change whom the child naturally looks to for guidance, discipline, the necessities of life, and parental comfort, then the established custodial environment will not have changed. [*Pierron*, 486 Mich at 86 (citation omitted).]

A child has an established custodial environment with both parents if the child "looks to both the mother and father for guidance, discipline, the necessities of life, and parental comfort." *Berger v Berger*, 277 Mich App 700, 707; 747 NW2d 336 (2008).

When determining whether and with whom the child has an established custodial environment, the focus is on the child's circumstances, not on the order or orders that created those circumstances. *Hayes v Hayes*, 209 Mich App 385, 388; 532 NW2d 190 (1995). Thus, "[t]he trial court's custody order is irrelevant to this analysis." *Id.*

A trial court may only amend its previous judgments or orders concerning child-custody determinations if the moving party shows a proper cause or change of circumstances. *Corporan*, 282 Mich App at 603. The existence of proper cause or a change of circumstances is a threshold consideration that the trial court must resolve before revisiting a custody order. *Id.* The trial court may (but need not) hold an evidentiary hearing to determine whether the circumstances rise to the level of a proper cause or change of circumstances. See *Vodvarka v Grasmeyer*, 259 Mich App 499, 514-516; 675 NW2d 847 (2003); *Corporan*, 282 Mich App at 605. The purpose of this framework is to "erect a barrier against removal of a child from an established custodial environment and to minimize unwarranted and disruptive changes of custody orders." *Vodvarka*, 259 Mich App at 509 (quotation marks and citation omitted).

A proper cause exists if there are "one or more appropriate grounds that have or could have a significant effect on the child's life to the extent that a reevaluation of the child's custodial situation should be undertaken." *Vodvarka*, 259 Mich App at 511. A change of circumstances warrants modifying a child's custodial environment only if, "since the entry of the last custody order, the conditions surrounding custody of the child, which have or could have a

*significant* effect on the child's well-being, have materially changed." *Id*. at 513. Normal life changes, whether positive or negative, are not sufficient to warrant such a change. *Id*. However, when a proposed parenting-time change does *not* modify the child's custodial environment, normal life changes may constitute a sufficient change of circumstance to warrant the parenting-time change. *Shade v Wright*, 291 Mich App 17, 30-31; 805 NW2d 1 (2010).

If a proposed modification would change the child's established custodial environment, the moving party must show by clear and convincing evidence that the change is in the child's best interests. *Pierron*, 486 Mich at 92. However, if the proposed modification does not change the child's custodial environment, the moving party must show by a preponderance of the evidence that the change is in the child's best interests. *Id*. at 93.

## V. THE MAJORITY'S FLAWED ANALYSIS

It is a legal adage that hard cases make bad law. The root of this adage is particularly applicable to this case:

> Great cases, like hard cases, make bad law. For great cases are called great, not by reason of their real importance in shaping the law of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment. These immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend. [*Northern Securities Co v United States*, 193 US 197, 400-401; 24 S Ct 436; 48 L Ed 679 (1904) (Justice HOLMES, dissenting).

In this case, the majority's instinct that flipping parenting time from favoring Orr to favoring Lieberman must be wrong has led it to shortcut through the proper legal framework with the pressure of a hydraulic saw.

First, the majority's method for reaching the result it seeks is to conflate a grant of physical custody with a child's custodial environment. In doing so, the majority ignores that the 2008 custody order has no bearing on whether and with whom the children have an established custodial environment. The trial court's custody order is *irrelevant* to determining the children's established custodial environment. *Hayes*, 209 Mich App at 388. The focus is on the children's actual environment, and "it makes no difference whether that environment was created by a court order, without a court order, in violation of a court order, or by a court order that was subsequently reversed." *Id*. at 388-389.

In reviewing the legal framework laid out in Section IV, one will notice that whether and to whom the trial court initially granted sole or primary physical custody is found nowhere within it. Indeed, one can read Judge Murray's excellent decision in *Vodvarka* until the cows come home and one will not find the phrase "physical custody" in that opinion. It is because, as this Court stated in *Hayes* and many times since, the *custody order* is irrelevant: the controlling consideration is the child's *custodial environment* at the time of the hearing.

In order to reach its desired result, the majority changes the paradigm that all courts use to resolve parenting time disputes. It casts out the courts' primary goal of minimizing disruptive

-6-

changes to the children's custodial environments. The majority then disregards the numerous court proceedings which have occurred since that divorce judgment. Traditionally, sole custody would result in one parent having significantly more overnights and joint custody would result in an approximately equal measure, but as these matters go, these labels lose meaning over time. Each situation is different and, because of modifications to parenting time, each situation is fluid. To whom the children look for love, guidance, and support is not determined by an initial custody label.

For this reason, the majority's conclusion that the trial court committed a clear legal error in evaluating the initial change of circumstances under *Shade* rather than under *Vodvarka* is fatally flawed. *Shade* provides that normal life changes may constitute a sufficient change of circumstances to warrant modifying parenting time but not the children's custodial environment. *Shade*, 291 Mich App at 30-31. *Vodvarka* provides that the children's conditions must have materially changed to warrant a parenting time modification that will affect the children's custodial environment. *Vodvarka*, 259 Mich App at 511. In either case, it is not the children's *physical custody* that is of concern, it is the children's *custodial environment*.

The parties do not dispute that the children have an established custodial environment with both parents and have had that environment for some time. And contrary to the majority's conclusion, for reasons that shall be discussed, the resulting change to parenting time in this case will not alter the children's established custodial environment. *Vodvarka* does not apply, and the trial court did not err by failing to apply it.[4]

Second, the majority's conclusion that an 85-day change in the number of parenting-time overnights must necessarily change the children's custodial environment is unsupported. The majority neatly sidesteps this issue by treating it as a legal issue when it is a factual issue. See *Pierron*, 486 Mich at 85 (stating that we review the trial court's decisions regarding whether and with whom the child has an established custodial environment as an issue of fact). As the attorneys illustrated through their vehement opposition at oral argument to setting a specific number of days as a threshold, no arbitrary number of days will determine to whom children look for love, guidance, and necessities.[5]

---

[4] Even if *Vodvarka* did apply, the trial court properly progressed to an evidentiary hearing. The trial court may hold an evidentiary hearing on the threshold question of whether a proper cause or change of circumstances exists to warrant a change of custody. See *Vodvarka*, 259 Mich App at 514-516; *Corporan*, 282 Mich App at 605. The trial court's decision to hold a hearing was appropriate in this case, where it was unclear whether the child's educational struggles rose to the level of a normal life change or a major life change, and where it was unclear whether the parenting time change would alter the children's custodial environment.

[5] The majority's conclusion leads me to question what number of days automatically transforms a parenting time change into a change of custodial environment—10 days, 20 days, 50 days, 85 days? While developing a cutoff might be helpful to some family law practitioners, such a mathematical approach would take into account only one factor of the multifaceted, factually complex issues of custodial environment. Such an approach would thus be extremely unwise.

The children had established custodial environments with both parents when the 140/225 day split favored Orr. The trial court found that the children would continue having established custodial environments with both parents when the 140/225 day split favored Lieberman. It based its finding on the facts that both parents are active parents, devoted to these children, and communicate with them regularly regardless of at whose house the children are staying overnight. While major changes in parenting time *may* result in a change to the children's established custodial environment, the majority treats this possibility as conclusive in this case solely on the basis that the change here involves 85 overnights. In doing so, it ignores the trial court's specific factual findings, when those findings were not against the great weight of the evidence.

## VI.  MY ANALYSIS

In analyzing these issues under the legal framework I have laid out in Section IV of this opinion, I conclude that the trial court's decision was legally sound and its factual findings were not against the great weight of the evidence.

## A.  PROPER CAUSE OR CHANGE OF CIRCUMSTANCES

Orr first contends that the trial court erred by finding that the youngest child's difficulties in school constituted a proper cause or change of circumstances sufficient to revisit the children's custody order. I disagree.

In *Corporan*, this Court considered whether a child's declining grades could constitute a change of circumstances that would warrant revisiting a custody order. *Corporan*, 282 Mich App at 608. In that case, the child had mixed grades in different subjects and was not in danger of failing any subject. *Id*. at 608-609. We concluded that the trial court's determination that a minor decline in the child's grades was not a material change of circumstances and was not against the great weight of the evidence in that case. *Id*. at 609.

*Corporan* does not stand for the proposition that a child's difficulties in school can never constitute proper cause or a change of circumstances. To the contrary, whether a child's academic struggles constitute a proper cause or change of circumstances sufficient to change a child's parenting time or custodial environment will depend on the magnitude of the child's difficulties and the effect those difficulties will have on the child's future. The trial court is uniquely equipped to resolve such factually intricate questions.

In this case, Lieberman alleged that the younger child was becoming deficient in foundational skills—reading and mathematics—that Ringey testified could pose a threat not only to the child's future educational success, but to the child's successes into adulthood.[6] The child

Unfortunately, by determining that an 85-day change necessarily alters an established custodial environment, the majority opinion has begun to construct the very mathematical cutoff that the litigants' attorneys advised against.

[6] While hygiene difficulties were also a factor in this case and played a part in determining the children's best interests, the parties and trial court clearly focused on the children's educational difficulties as its basis for altering parenting time.

-8-

was nearing the cutoff point for academic risk and was at the 29th and 27th percentiles, respectively, among students his age. Unlike the child in *Corporan*, the child in this case was at a serious educational risk from a deficiency that posed a threat to the child's long-term success. In my opinion, the child's academic difficulties were serious enough that the trial court would have been warranted in finding that they rose to the level of significantly affecting the child's wellbeing under *Vodvarka*.[7] I conclude that under the facts of this case, the trial court's decision to revisit the parenting time order was not against the great weight of the evidence.

## B. ESTABLISHED CUSTODIAL ENVIRONMENT VERSUS PHYSICAL CUSTODY

Orr next contends that the trial court erred when it found that the children had an established custodial environment with both parents because the parties' divorce order granted her sole physical custody. According to Orr, this fact alone results in a change of custody. I could not more vehemently disagree. As I discussed in Section IV of this opinion, a parenting time modification does not necessarily change a child's established custodial environment.

In this case, both parents provided the children with loving and supportive home environments. Both parents engaged the children in activities that suited the children's interests. Both parents discussed how the children came to them with difficulties, to seek comfort and advice. The children completed school assignments at both homes, and both parents were significantly involved in the children's education. I conclude that the trial court's finding that the children had an established custodial environment with both parents was not against the great weight of the evidence.

Second, Orr contends that the trial court erred when it found that modifying the children's parenting time would not alter their established custodial environment. Again, I disagree.

While a change in parenting time from 225 overnights to 140 overnights is certainly at the outer edge of a parenting time change (and to some practitioners and at least two appellate judges, beyond a cutoff), I cannot say that the trial court's finding that it would not change the children's established custodial environment was against the great weight of the evidence. Orr provided no evidence to support her assertions that this change would alter how the children look to her for guidance, necessities, and support. To the contrary, Lieberman was able to maintain an established custodial environment with the children while having exactly the same parenting time schedule to which Orr objects. And the record indicates that both parents have striven to maintain close bonds with their children, provide them with physical comforts, engage them in their interests, and counsel them when they have difficulties, and intend to continue to do so in the future. There is no evidence to support that the altered parenting time schedule would change to whom the children look for guidance, support, and necessities. Accordingly, I conclude that the trial court's finding was not against the great weight of the evidence.

---

[7] My conclusion would render moot the question of whether the trial court properly applied *Vodvarka* or *Shade*. Under either standard, the trial court properly revisited the children's parenting time.

## C. THE CHILDREN'S BEST INTERESTS

Orr contends that the trial court clearly erred by applying the preponderance of evidence standard to the children's best interests instead of the clear and convincing evidence standard. I disagree.

Orr bases her argument on her previous assertion that the trial court improperly found that a parenting time modification would not change the children's established custodial environment. However, because I have rejected that argument, the preponderance of the evidence standard was the appropriate standard. The trial court considered all the relevant best-interest factors in reaching its conclusion. I conclude that the trial court applied the proper standard when determining the children's best interests.

## VII. CONCLUSION

Under the unique set of facts of this case, the trial court concluded that while both Lieberman and Orr were excellent parents, a change in schools was necessary to accommodate the struggling child's educational needs. To change schools, the trial court was required to flip parenting time in favor of Lieberman. While the flip appears to be at the outer edge mathematically speaking, standing alone, it provides no basis to overturn the trial court's finding that this change would not alter the children's custodial environment. I cannot conclude that the trial court committed clear legal error in its framework, that its decision was against the great weight of the evidence, or that it abused its discretion in its parenting time decision. The trial court made a difficult, but correct, decision.

I would affirm the trial court's supported and well-reasoned decision.

/s/ Peter D. O'Connell